867 So.2d 879 (2004)
ESTATE OF Mary MESSINA, Plaintiff-Appellant
v.
STATE of Louisiana, DEPARTMENT OF HEALTH AND HOSPITALS, Defendant-Appellee.
No. 38,220-CA.
Court of Appeal of Louisiana, Second Circuit.
March 3, 2004.
*880 Anthony J. Bruscato, Monroe, for Appellant.
Neal R. Elliott, Jr., Baton Rouge, Rene Simone Millet, for Appellee.
Before WILLIAMS, STEWART and CARAWAY, JJ.
CARAWAY, J.
The family of an applicant for Medicaid benefits appeals the state's denial of her application for long term care benefits. The administrative law judge ("ALJ") ruled for the state, finding that within thirty-six months of the application, the applicant had transferred property which she used as her residence to other family members for less than the fair market value of the home. The district court affirmed the ruling of the ALJ, and for the following reasons, we also affirm.

Facts
Upon moving into a nursing home on March 31, 2000, Mary Messina ("Mary") applied for Long Term Care ("LTC") vendor benefits under the Medicaid program. She resided at the nursing home until her death from cancer approximately five weeks later, and this dispute concerns the reimbursement to her family of the costs of her nursing home care for that time period.
Mary's application for LTC stated that before moving into the nursing home, she lived in an "estate home." The Louisiana Department of Health and Hospitals ("DHH") conducted a routine asset clearance check and turned up information from the parish conveyance records that Mary had recently been the record owner of property at 2804 Anita Lane in Monroe. The tax notice reflected a homestead exemption on the property in Mary's name. The DHH review found that the property was sold by Mary for $110,000 on June 24, 1999 (hereinafter the "1999 Deed"), and that the new owners were Mary's six surviving siblings. The 1999 Deed was *881 recorded in Ouachita Parish on July 13, 1999.
DHH's discovery of the details of the 1999 Deed triggered the application of federal and state LTC eligibility rules which provide that the transfer of an asset for less than fair market value within a thirty-six month look-back period can render an individual applicant ineligible for medical assistance for a certain number of months based upon the value of transferred property. The caseworker contacted Mary's family advising them of the ramifications of the asset transfer, and this dispute over the Medicaid benefits resulted.
A hearing before an ALJ for the Department was held in September 2000. The Messina family presented evidence showing that the Anita Lane home was acquired from a third party by Messina Real Estate in 1969. Mary's father owned 40 shares in the corporation; her mother, herself and her eight siblings each owned one (1) share, for a total of 50 outstanding shares. A few months after the corporation acquired the property, it conveyed a lifetime usufruct to Mary so that she would be eligible for the homestead exemption. After Mary's parents died, the corporation transferred the home to Mary in 1986 for $27,250, (the same consideration paid by the corporation when it acquired the property in 1969). The Messina family claimed that no cash was paid for the transaction. The home was always considered as the parents' home, but available to the children should they need a place to live. Mary, however, was the principal resident of the home. Mary had never married, and although title to the family home was placed in her name, "it was always the understanding of all of [the Messina siblings] that each had a shared ownership in the home." The family claimed that the property formed part of each sibling's inheritance from their parents.
Although the consideration stated in the 1999 Deed was $110,000, an unrecorded counterletter acknowledged by all the parties stated that no payment was made for the deed. The counterletter, which set forth the history of the family home detailed and quoted above, was also dated June 24, 1999 and signed by Mary as an authentic act.
The ALJ reviewed the family's rebuttal information contained in the counterletter and ultimately rejected their claim. The ALJ concluded that the $110,000 uncompensated value had to be counted in determining eligibility for Medicaid coverage for nursing facility services, which resulted in 55 months of ineligibility, and that Mary would not have become eligible for medical assistance until February, 2004.
The ALJ's opinion concluded that "it is not shown convincingly that the transfer was solely for purposes other than qualifying for LTC vendor payment." Thereafter, in December, 2000, appellant filed a petition for judicial review in the district court, pursuant to the provisions of the Administrative Procedure Act (La. R.S. 49:950, et seq.). The trial court upheld the ALJ's findings and rendered judgment accordingly. It is from this judgment that the Messina family appeals.

Discussion
The Medicaid Program, established in 1965 as Title XIX of the Social Security Act (42 U.S.C. § 1396, et seq.) provides federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons.[1]Case of *882 Hamner, 427 So.2d 1188 (La.1983). The Medicaid Eligibility Manual ("Manual") of DHH determines standards for Medicaid eligibility for long term care nursing facilities. (Manual §§ B-100, B-300). Eligibility for LTC vendor payments is specifically based on the applicant's need, calculated based on income and resources. (Manual § H-831.4). The value of immovable property is counted as a resource, including "home property." Home property is defined as "property in which [the applicant] has an ownership interest and that serves as his or her principal residence." (Manual § 1634.28). If resources are greater than the Supplemental Security Income resource limit of $2000, the applicant is ineligible for LTC. (Manual § Z-900 Charts).
The Omnibus Budget Reconciliation Act of 1993 ("OBRA") incorporated new requirements for treatment of transfers of assets for less than fair market value. (Manual § I-1674). Such transfers are presumed to be for the purpose of qualifying for LTC vendor payment, unless the individual can prove convincingly that the transfer was made for some other purpose. In addition, OBRA provided that "[e]ffective for transfers occurring on or after August 11, 1993, that state must develop uncompensated value of transfers occurring during the 36 month look-back period before application for institutional coverage and anytime thereafter." "Uncompensated value" is the difference between the fair market value at the time of the transfer and the amount received for the asset. (Manual §§ I-1674, 1675). Manual § I-1676 provides that LTC vendor payments shall not be made during a penalization period which begins with the month of the transfer and extends until the total cumulative uncompensated value is depleted. This is determined by dividing the uncompensated value by the average monthly cost of LTC services, which, in 1999, was $2000 per month. After such a transfer penalty is calculated and assessed, the individual will be ineligible for Medicaid during *883 the penalty period. The applicant has the opportunity to rebut the presumption that the transfer was made to become eligible for Medicaid. (Manual § I-1679).
State judicial review of an agency adjudication is governed by the provisions of Louisiana's Administrative Procedure Act (La. R.S. 49:950, et seq.). The scope of judicial review of an agency adjudication was set forth by this court in Holiday Bossier Ltd. Partnership v. La. Tax Commission, 574 So.2d 1280, 1285 (La.App. 2d Cir.1991), writ denied, 578 So.2d 136 (La. 1991) as follows:
La. R.S. 49:964 provides that the scope of review shall be confined to the record. Where an administrative agency or hearing body is the trier-of-fact, the courts will not review the evidence before such body except for the following limited purposes: 1) to determine if the hearing was conducted in accordance with the authority and formalities of the statute; 2) to determine whether or not the fact findings of the body were supported by substantial evidence; and, 3) whether or not the hearing body's conclusions from these factual findings were arbitrary or constituted an abuse of the hearing body's discretion.
The Messina family disputes the ALJ's determination of Mary's ownership of the home which was valued in the 1999 Deed at $110,000. The family argues that the counterletter which Mary executed indicates that she never owned the home and that she received nothing for the transaction. They therefore argue that the 1999 Deed was not executed to establish Medicaid eligibility.
As an initial matter, we do agree with the Messina family that the counterletter may be considered under Louisiana law for the determination of ownership in this instance. La. C.C. art.2025. The 1999 Deed was not a sale because, contemporaneously with that act, Mary executed a counterletter indicating that no price was paid to her. As between the parties to that transaction, including Mary's siblings who remain the record owners of the property under the 1999 Deed, Mary's interest in the home was at least intended to be conveyed as a donation. Both documents were not required to be recorded to be effective among the parties and may be considered in this context. DHH is not analogous to a third party purchaser or an acquirer of a real right in property whose interest would be protected by the rules of recordation. Rather, its interest involves the saleable value that Mary transferred without benefitting from a fair market return, which gives rise to the presumption under the regulations that the purpose of the transfer was to establish Medicaid eligibility.
Nevertheless, in spite of the family's arguments to the contrary, Mary was shown to have an undivided interest in the home and did make a transfer of property as a result of her June 24, 1999 transactions. The counterletter indicates that Mary was a co-owner with her siblings and that her family acquiesced in her exclusive possession of the property. As a co-owner, Mary was entitled to use the home under La. C.C. art. 802 and other provisions of our law dealing with co-ownership. Contrary to the family's argument, Mary did not owe her siblings anything for her use of the property. Her co-owners acknowledged their intent to allow her that special occupancy right in the family home. Mary therefore divested her rights as a co-owner by executing the 1999 Deed and counterletter. While the value of that divestiture was not the entire $110,000 value attributed to the home, it was enough to permit assessment of a ten-month penalty *884 in this instance.[2] The value assignable to Mary's interest because of her continued occupancy was more than that of the mere fractional interest in the property which she owned as an heir of her parents. Had the ownership value not been transferred prior to her application, her eligibility for LTC vendor payments (less than $2000 in resources) would clearly have been denied. Accordingly, we do not find an abuse of discretion from the ALJ's determination that the plaintiffs failed to meet their burden of showing that the transfer was solely for purposes other than qualifying for Medicaid LTC benefits.

Conclusion
For the above reasons, the judgment of the trial court is AFFIRMED.
Costs of the appeal are assessed to appellant.
AFFIRMED.
NOTES
[1] The applicable portions of Title 42 of the United States Code dealing with the administration of Social Security and Grants to the States for Medical Assistance Programs provide in § 1396p as follows:

(c) Taking into account certain transfers of assets
(1)(A) In order to meet the requirements of this subsection for the purposes of Section 1396a(a)(18) of this title, the State plan must provide that if an institutionalized individual or the spouse of such an individual (or, at the option of a State, a noninstitutionalized individual or the spouse of such an individual) disposes of assets for less than fair market value on or after the look-back date specified in subparagraph (B)(i), the individual is ineligible for medical assistance for services described in subparagraph (C)(i) (or, in the case of a noninstitutionalized individual, for the services described in subparagraph (C)(ii)) during the period beginning on the date specified in subparagraph (D) and equal to the number of months specified in subparagraph (E).
* * *
(C)(i) The services described in this subparagraph with respect to an institutionalized individual are the following:
(I) Nursing facility services.
* * *
(2) An individual shall not be ineligible for medical assistance by reason of paragraph (1) to the extent that
(A) The assets transferred were a home and title to the home was transferred to
* * *
(iii) a sibling of such individual who has an equity interest in such home and who was residing in such individual's home for a period of at least one year immediately before the date the individual becomes an institutionalized individual;
* * *
(C) a satisfactory showing is made to the State (in accordance with regulations promulgated by the Secretary) that (i) the individual intended to dispose of the assets either at fair market value, or for other valuable consideration, (ii) the assets were transferred exclusively for a purpose other than to qualify for medical assistance, or (iii) all assets transferred for less than fair market value have been returned to the individual.
[2] The $2000 per month penalty provision under the DHH regulation would begin at the time of the July 1999 recordation of Mary's transfer. With an uncompensated value of at least $20,000, the penalty would still have remained in effect for the five-week period in question during the spring of 2000, when she sought LTC vendor payments.