939 So.2d 550 (2006)
Ruby COX, Plaintiff-Appellee
v.
SECRETARY, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS, Defendant-Appellant.
No. 41,391-CA.
Court of Appeal of Louisiana, Second Circuit.
August 25, 2006.
Rehearing Denied September 21, 2006.
*551 Neal R. Elliott, Jr., Baton Rouge, for Appellant, Louisiana Dept. of Health & Hospitals.
Pesnell Law Firm, by W. Alan Pesnell, for Appellee, Ruby Cox.
Before WILLIAMS, STEWART and LOLLEY, JJ.
LOLLEY, J.
The Louisiana Department of Health and Hospitals ("LDHH") appeals a trial court judgment of the Second Judicial District Court, Parish of Jackson, State of Louisiana, ruling that the plaintiff, Ruby Cox[1], was entitled to long-term care ("LTC") Medicaid benefits. The trial court concluded that the administrative law judge committed an error of law in finding that Ruby Cox's husband, Virgil Cox, had made a transfer of assets for less than fair market value and therefore Ruby Cox was not eligible for LTC Medicaid benefits. For the following reasons, we reverse the trial court's decision and reinstate the decision of the administrative law judge.

FACTS
Procedural History
Ruby Cox ("Mrs. Cox") entered a long term nursing facility in October, 2003. *552 Virgil Cox ("Mr. Cox") originally applied for LTC Medicaid benefits on behalf of his institutionalized wife, Mrs. Cox, on or about October 27, 2003. In December, 2003, Mrs. Cox received Medicaid health care coverage but was denied LTC Medicaid benefits due to excessive resources which were deemed available to her. The Coxes requested a "fair hearing" to rebut the decision, and again were denied. Subsequently, they sought a judicial review of the administrative law judge's decision ("ALJ") and the trial court reversed and remanded the case for a redetermination of eligibility.
On redetermination, Mrs. Cox was again denied LTC Medicaid benefits, this time based on a transfer of assets (a loan) from Mr. Cox to their son, Kevin, for less than fair market value  an action that is penalized when determining eligibility for LTC benefits. A second "fair hearing" was held on March 31, 2005, and the LTC benefits were again denied based on the transfer of assets for less than fair market value. A judicial review was sought, and the trial court reversed the ALJ's ruling and determined Mrs. Cox to be eligible for LTC Medicaid benefits.
Details about the Loan from Mr. Cox to Kevin Cox
On July 24, 2003, Mr. Cox loaned to his son, Kevin, the sum of $68,000.00. In consideration for this loan, Kevin executed a promissory note payable to the order of Virgil W. Cox, Jr. The promissory note set forth 84 equal monthly installments in the amount of $365.04, due on the first day of each month beginning September 1, 2003, and ending on August 1, 2010, with a final balloon payment in the amount $59,802.48. Additionally, the note carried an interest rate of 5%, per annum.
The instrument at issue was non-negotiable and non-transferable by Virgil W. Cox, Jr., and the note specifically stipulated there shall be no cash surrender value for any party. Any transfer, assignment or pledge of the instrument by Virgil W. Cox, Jr., would immediately void the instrument and the instrument was further non-assumable. The note also carried a penalty for late payments, failure to pay, and set forth attorney's fees in the event attorneys were needed. Kevin made the required monthly payments and wrote a number of checks to Mr. Cox. However, Mr. Cox did not cash the checks until March 23, 2006, a week before the second "fair hearing." Furthermore, this court notes that Mrs. Cox died on April 3, 2004.

DISCUSSION
In the instant case, the issue is whether Virgil Cox, as spouse of Ruby Cox, transferred an available resource for less than fair market value for purposes of qualifying for Medicaid benefits. The LDHH assigns as error that the trial court erred in finding Mrs. Cox was entitled to LTC Medicaid benefits, reversing the ALJ's ruling.
Standard of Review
The standard of review for this case is clearly stated in our prior decision in Smith v. State, Department of Health and Hospitals, 39,368 (La.App. 2d Cir.03/02/05), 895 So.2d 735, writ denied, XXXX-XXXX (La.06/17/05), 904 So.2d 701 (citations omitted):
When reviewing an administrative final decision in an adjudication proceeding, the district court functions as an appellate court. Once a final judgment is rendered by the district court, an aggrieved party may seek review of same by appeal to the appropriate appellate court. On review of the district court's judgment, no deference is owed by the court of appeal to the factual findings or legal conclusions of the district court, just as no deference is owed *553 by the Louisiana Supreme Court to factual findings or legal conclusions of the court of appeal. Thus, an appellate court sitting in review of an administrative agency reviews the findings and decision of the administrative agency and not the decision of the district court.
The applicable standard of review is set forth in La. R.S. 49:964. Section F of La. R.S. 49:964 provides that a reviewing court is confined to the record established before the agency (except in cases of alleged irregularity in procedure before the agency). A reviewing court's function is not to weigh de novo the available evidence and to substitute its judgment for that of the agency. Nevertheless, the district court and the court of appeal have the authority to reverse or modify the decision of the agency if substantial rights of the party seeking review have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the agency's statutory authority; (3) made upon unlawful procedures; (4) affected by other error of law; (5) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (6) manifestly erroneous in view of the reliable, probative and substantial evidence in the record.
Medicaid Program Background
The Medicaid program, established in 1965, provides federal funds to states choosing to reimburse certain costs of medical treatment of needy persons. Estate of Messina v. State Department of Health and Hospitals, 38,220 (La.App. 2d Cir.03/03/04), 867 So.2d 879. States participating in the program are required to institute reasonable standards for determining eligibility that are consistent with the objectives of the program, and these standards must consider only resources and income available to the applicant and provide a reasonable method for evaluating such resources and income. Ouzts v. Secretary, Louisiana Department of Health and Hospitals, 38,634 (La.App. 2d Cir.07/29/04), 880 So.2d 918. The LDHH created a Medicaid Eligibility Manual ("manual"), based on the State Medicaid Manual issued by the Federal Health Care Financing Administration, to determine standards for Medicaid eligibility for long-term care nursing facilities. Eligibility for LTC vendor payments is specifically based on an applicant's need, calculated based on income and resources. See Estate of Messina, supra.
Before interpreting and applying the provisions of our state's manual, we note at the outset that because Medicaid was designed to help pay for the medical treatment of needy individuals, it essentially is a provider of last resort; the provisions regulating Medicaid are not estate planning tools for those able to meet their needs through other means. The question herein involves the provisions of the manual, based on federal requirements, concerning transfers of assets for less than fair market value.
Louisiana's Medicaid Manual and Applicable Provisions
The manual does allow certain transfer of assets to occur without penalty and are not considered when determining eligibility. Section I-1534.45 of the manual provides that income received as the result of valid loan agreements is not counted as income. In the general provision section of the manual a "valid loan" is defined as "a legally binding agreement made in good faith," and also states that an informal loan should be considered valid if it is binding under state law and includes certain basic elements. (Emphasis added.) *554 On the other hand, transfers that do not meet the handful of provisions established in the manual as valid transfers "are presumed to be for the purpose of qualifying for LTC vendor payment unless the individual can prove convincingly that the transfer was for some other purpose." Here, there are several undisputed facts that force us to question whether the transaction at issue was made in "good faith" and gives rise to the presumption set forth in the manual. Lack of good faith would be present in a sham transaction made for the purpose of obtaining Medicaid benefits; therefore, we examine the indicia of good faith vel non, including, when appropriate, the value given and received in a transaction. To evaluate this issue we look to the other sections of the manual for guidance.
The section of the manual specifically dealing with transfer of resources for less than fair market value contains a general information section (I-1671) stating in part:
Public Law 96-611 originally amended the Social Security Act to establish a penalty for transferring non-excluded resources at less than fair market value (FMV) in order to become eligible for benefits. The statute presumes that the transfer of a resource for less than fair market value was for the purpose of establishing Medicaid eligibility unless the individual presents convincing evidence that the transfer was exclusively for some other purpose.
The Medicare Catastrophic Coverage Act of 1988 (Public Law 100-360) made fundamental changes in the transfer of resources policy applicable under Medicaid while eliminating the statutory requirement for SSA/SSI eligibility effective for transfers of resources for less than fair market value occurring on or after July 1, 1988.
The Omnibus Budget Reconciliation Act of 1993 (OBRA 1993) further amended the transfer provisions to include new requirements for treatment of transfers of assets for less than fair market value and for treatment of trust funds applicable to all trusts established and all transfers made on or after August 11, 1993 (emphasis in original).
In the instant case, we note that both the application for institutional coverage herein and the date of the alleged transfer for less than fair market value occurred subsequent to August 11, 1993. Therefore, we look particularly to the provisions of that section of the manual (I-1674) that addresses transfers on or after August 11, 1993.
Section I-1674 states that for transfers of assets, which includes income and resources, occurring on or after August 11, 1993, the state must develop the uncompensated value of such transfers occurring during the 36-month period before application for institutional coverage and any time thereafter, also known as the "look-back period." Transfers of assets for less than fair market value made after August 11, 1993, by an institutionalized individual or the individual's spouse are presumed to be for the purpose of qualifying for LTC vendor payment unless the individual can prove convincingly that the transfer was for some other purpose. In all cases, the individual shall be offered the opportunity to rebut the presumption, and evidence must be provided that establishes the transfer was solely for a reason other than to qualify for Medicaid.
Section I-1674 also contains definitions that apply to transfer of assets. "Assets" are defined as all income and resources of the individual and the individual's spouse. "Resources" are given the same definition used by the Supplemental Security Income (SSI) program except that the home is not *555 excluded for institutionalized individuals. In turn, under Section I-1634 covering types of SSI-related resources, cash is a resource (I-1634.8). With respect to loans, Section I-1634.20 provides that when the applicant/recipient is the lender, the resource rule is provided by Section I-1634.22, entitled "Mortgages and Promissory Notes." This section recognizes that a promissory note may be negotiable or non-negotiable. The section continues to explain that while a negotiable promissory note is a resource, a non-negotiable promissory note is not a resource because there is a legal bar to the transfer of ownership; the total payment on such a note (principal and interest) is countable as unearned income.
Turning back to the definitions in Section I-1674, "fair-market value" is defined as the value of an asset, if sold at the prevailing price at the time it was actually transferred. For an asset to be considered transferred for fair market value or to be considered to be transferred for valuable consideration, the compensation received for the asset must be in a tangible form with intrinsic value. "Intrinsic Value" is defined as something that has value in and of itself, while "Valuable Consideration" means that an individual receives in exchange for his or her right or interest in an asset some act, object, service, or other benefit which has a tangible and/or intrinsic value to the individual that is roughly equivalent to or greater than the value of the transferred asset. "Uncompensated Value" is the difference between the fair market value at the time of transfer (less any encumbrances) and amount received for the asset.
Analysis of the Cox "Loan"
Applying the definitions and concepts discussed above to the facts of the instant case, we conclude that the trial court should not have reversed the administrative law judge's finding that there was a transfer of assets for less than fair market value. The $68,000 given by Mr. Cox to his son in exchange for the non-negotiable promissory note plainly was an asset. However, the non-negotiable promissory note that Mr. Cox received in compensation was not an asset. The note specifically stated that it had no cash surrender value for any party; thus, while the $68,000 would have been available, but for the alleged loan, to pay for nursing home expenses, the promissory note could not be used for that purpose.
Moreover, the note was non-transferable so that Mr. Cox could not sell the note to a third party, as he could with a negotiable instrument, in order to raise money to pay for nursing home expenses. Thus, subsequent to the alleged loan, instead of a $68,000 resource, Mr. Cox had a non-negotiable instrument with no surrender value that generated only $365.04 per month. The "fair market value" of the original asset was $68,000, but the non-negotiable promissory note received in return had no intrinsic value; as previously noted, for an asset to be considered transferred for fair market value or to be considered to be transferred for valuable consideration, the compensation received for the asset must be in a tangible form with intrinsic value.
Despite the presumption that a transfer for less than fair market value is for the purpose of qualifying for Medicaid, we also observe additional facts that weigh in favor of a finding that the transaction at issue was not made in good faith as a simple loan, but was made to divest assets in order to qualify for Medicaid. The additional facts include that: the alleged loan was made only a few months before the application was filed; the alleged loan had a very large final balloon payment of almost 88% of the face amount of the loan; the checks for the small monthly payments *556 ($365.04 per month) were not cashed until a little over a week before the March 2005 hearing; and, Mrs. Cox, who was approximately 78 years old, entered the nursing home less than two weeks after the first installment payment was due.
The Coxes argue that the LDHH should not have applied Section I-1674 because Section I-1671 indicates that a valid loan is not to be considered a transfer. As previously noted, Section I-1671 contains general information concerning the transfer of a resource at less than fair market value, and emphasizes the importance of applying the policy in effect at the time of the application for institutional coverage and the date of transfer. Section I-1674 is the specific section of the Medicaid Eligibility Manual containing valid exceptions and penalized types of transfers, on or after August 11, 1993.
Here, the transaction on its face is arguably a "formal promissory note" which can be characterized as a valid loan. However, to stop the inquiry there would be to turn a blind eye to the stated policy changes promulgated by OBRA 1993. The policy change specifically heightened the consideration of transfers of assets by any action taken, either by the individual or by any other person, "that reduces or eliminates the individual's ownership or control." Clearly the alleged loan eliminated Mr. Cox's ownership of $68,000 in exchange for a non-negotiable note with no cash surrender value, and no transferability, backed by only an unsecured promise.
Using a resource to make a purchase, where the item purchased is of roughly equivalent value to the price paid, certainly would not be a transfer for less than fair market value to which a penalty should apply. However, paying a large sum of money for a trinket is exactly the kind of transaction to which a penalty should attach and would have exactly the same improper result as selling a valuable asset for a paltry price. Accordingly, the manual instructs a case worker to not consider as a transfer the using of a resource in a legally binding agreement made in good faith. Conversely, use of a resource should be counted as a transfer to which a penalty applies if the transaction had no legally binding effect or was not made in good faith.
Considering the value given and received in the alleged loan, where $68,000 was exchanged for a non-negotiable promissory note with no cash value, leads to the conclusion that a transfer for less than fair market value occurred. Accordingly, this transfer is presumed to be for the purpose of obtaining LTC Medicaid benefits and, by definition, would not be one made in good faith so as to constitute a valid loan that would qualify as an exception from the policy that penalizes transfers of resources. Furthermore, the record contains the additional facts, referred to above, that also weigh in favor of a finding that the transaction was made for the purpose of obtaining LTC Medicaid benefits.
Finally, we again note the clear purposes underlying the state and federal provisions concerning penalizing certain assets transfers, as well as the specific provisions of Section 1674 which apply to transfers, like this one, that occurred on or after August 11, 1993, require that the transfer at issue herein be subject to the penalty provisions for transfers of assets for less than fair market value. These provisions do not prevent an applicant/recipient from transferring assets, but simply delay the time at which LTC Medicaid payments will commence. Unfortunately, due to Mrs. Cox's death only a few months after entering the nursing home, this delay extended beyond the date of her death. After a thorough review of the record, we agree with the ALJ's findings.

*557 CONCLUSION
For the reasons set forth above, the judgment of the trial court is hereby reversed, and the decision of the administrative law judge is hereby reinstated at appellee's costs.
REVERSED AND RENDERED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, PEATROSS and LOLLEY, JJ.
Rehearing denied.
BROWN, J., would grant rehearing.
NOTES
[1] Ruby Cox died during the course of this litigation. Her husband, Kevin Cox, was appointed Administrator of the Succession of Ruby Cox, and was substituted as party-plaintiff by a motion granted by this court.