Judgment rendered June 29, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,610-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

DEPT. OF CHILDREN & FAMILY          Plaintiff-Appellee
SERVICES – CW
DOCKET NO: 2019-7392
AGENCY NO: 0002816896

IN THE MATTER OF FREGENER          Defendant-Appellant
DAVIS HENDERSON

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 163,238

Honorable Charles A. Smith, Judge

* * * * *

DAVIS LAW FIRM, LLC          Counsel for Appellant
By: S.P. Davis, Sr.

HARRIS LAW FIRM, LLC
By: Courtney N. Harris

STATE OF LOUISIANA, DCFS          Counsel for Appellee
By: James M. Hoffman
     Penya Marzula Moses

DIVISION OF ADMINISTRATIVE LAW
By: Lindsey K. Hunter
     Lacy Shuffield Norris

* * * * *

Before MOORE, PITMAN, and ROBINSON, JJ.

**PITMAN, J**.

Fregener D. Henderson ("Henderson") appeals the judgment of the Administrative Law Judge ("ALJ"), who reviewed and affirmed a valid finding of dependency brought against her by the Louisiana Department of Children and Family Services ("DCFS"). For the following reasons, we affirm.

## FACTS

On June 4, 2018, Henderson's adopted child, Q,[1] was removed from her home by the DCFS and placed in foster care.

On May 22, 2019, the DCFS notified Henderson that it completed the child abuse and/or neglect investigation for a report involving a child in her care and determined that the report was justified, or valid, for dependency of her minor child, Q. Henderson requested an administrative hearing pursuant to La. Ch. C. art. 616.1.1, which provides administrative appeal rights when a report alleging abuse or neglect of a child is determined to be justified or valid[2] by the DCFS. The ALJ conducted an eight-day telephone hearing and was presented with a voluminous record regarding Q's medical and social history. He determined that the DCFS proved, by a preponderance of the evidence, that Henderson's actions met the criteria necessary to place her name on the State Central Registry[3] as a valid perpetrator of child abuse or neglect.

---

[1] To protect the privacy of any child mentioned herein, only the child's initials are used in this opinion. *See* La. R.S. 46:56; *see also* La. Const. art. 1, section 5.

[2] The words justified and valid are used interchangeably, but the May 22, 2019 letter states that "justified" would thereafter be referred to as "valid."

[3] The State Central Registry is a database used for background checks by the Department of Education for its *Child Care Civil Background Check System* and the DCFS for its *Louisiana Child Abuse and Neglect Clearance System* and *Child Protective Services Program* for current and prospective employees of the DCFS and other agencies

During the hearing, Henderson testified on her own behalf; and the following persons testified at her request:  Dr. Gregory Brown; Jon Barnes, FNP; Dr. Lionel Guillaume; Jerell Scott; and Kergener Davis.  Henderson submitted multiple exhibits.

The DCFS called several witnesses:  Benjamin Lacy, a DCFS investigator-supervisor; Michelle Gafford, a DCFS investigator; Rolanda Stanley, a DCFS supervisor; Maurice Watkins, a DCFS investigator; Jessica Feeback, Q's teacher; Jessica Smith, a DCFS foster care worker; Reginald Hodge, Q's present foster parent; Dr. John Simoneaux, a psychologist; Christi Thomas, a DCFS supervisor; and Robin Turner, a DCFS consultant. The DCFS submitted 18 exhibits into evidence.

The following facts are gleaned from the testimony and exhibits presented by both the DCFS and Henderson.  Q was born on September 11, 2008.  He lived with his biological mother for two years.  During that time he was raised in an unstable and chaotic environment and allegedly was exposed to inappropriate adult behavior.  Henderson adopted him on the day before his fourth birthday in 2012 after his biological mother's parental rights were terminated.  Henderson testified that Q arrived at her home with many pre-existing conditions, including allergic rhinitis, maternal hepatitis C, developmental delays in speech, communication disorder, disruptive disorder, fetal alcohol syndrome and post-traumatic stress disorder.

_____

and homes where children were placed.  Whether or not an individual's name is placed on the registry depends on the tier level assigned to a valid finding by the DCFS.  The DCFS Child Welfare Policy 4-220.  The notice to Henderson states that this case was assigned as a Tier 2 investigation and that her name would be added to the State Central Registry after her appeal rights had been exhausted.

Henderson also testified that Q displayed inappropriate sexual behavior shortly after he entered her home and that his behavior worsened as he aged.

Henderson stated that Q acted out sexually with his teddy bear, urinated in his bed, looked under girls' skirts at school, fondled a child and told Henderson that he wanted to kill children and the teacher. According to Henderson, he also tried to kill her niece because she asked him to throw away some trash, told her he wanted to have sex with his sister, told her he hated black people even though he himself is African-American, tried to kill at least three dogs, was a danger to other children, wanted to touch the genitals of both male and female children and adults, and masturbated 15 times a day. She testified that he urinated everywhere in the house, in the car and while his home-school teacher was sitting at the table with him. He told her he wanted to go back to Georgia (where she once put him in a psychiatric hospital) because he wanted to have sex with a man there.

Henderson sent Q to a number of facilities for psychiatric treatment based on physician referrals. Because he was often in these facilities for long periods of time, he attended school in those facilities. The year he was eight years old, Q was admitted to ten mental health facilities and was placed on medications for mental issues Henderson claimed he had. During his early life with Henderson, Q was diagnosed with the following illnesses, disorders, syndromes or symptoms: intermittent explosive disorder and conduct disorder, childhood onset; depressive/anxiety disorder; attention deficit/hyperactivity disorder; disruptive mood dysregulation disorder; anger management and impulse control, homicidal ideations; oppositional defiant disorder; emotional disturbance; sexual disorder; attention deficit/hyperactivity disorder; reactive attachment disorder; R/O antisocial

3

personality disorder; bipolar with psychotic features; schizophrenia; and auditory hallucinations. Q was prescribed numerous medications by many doctors and nurse practitioners because of these diagnoses, including Seroquel, Tenex, Prozac, Zoloft, Zyprexa and Trileptal, as listed on DCFS Exhibit 8.

Dr. John Simoneaux, a licensed psychologist, performed a forensic psychological evaluation of Q's medical records and all documentation submitted by the DCFS and Henderson concerning Q. He wrote a 24-page report on his observations during interviews and testing with Q and Henderson on September 18 and 20, 2018, and October 31, 2018. He reviewed all of the medical records that Henderson submitted regarding Q's hospitalizations.[4] All of the hospital admissions began with multiple diagnoses and symptoms as described by Henderson to the physicians and administrators. Based on his experience,[5] Dr. Simoneaux stated that he had not seen any child who exhibited these many behaviors together as described by Henderson. He stated that Q has been diagnosed with mental illnesses that are diagnosed only in adults. Throughout the report, in which he addressed the findings of each hospital, he warned that he could not tell whether the doctors at the hospital actually observed Q behaving in these ways or if they simply took Henderson's word that Q typically behaves that way.

---

[4] These same medical records are the ones submitted by Henderson in support of her appeal of the valid determination of dependency.

[5] Dr. Simoneaux's experience included years of working in an in-patient psychiatric unit for adolescents and children, where he evaluated children and adults for trauma, abuse and, specifically, sexual abuse.

Dr. Simoneaux's observation of Q was that he is a very bright and sweet child and that he exhibited none of the behaviors attributed to him by Henderson. His assessment of Q is that he was pleasant, cooperative and a totally normal young male. He stated that Q laughed easily, was excited about everything and was clearly intellectually quite able. Previous school evaluations indicated that Q had high levels of intellectual achievement. Q confirmed to him that his mother routinely made him say things had happened that had not actually happened. The report also remarks that Q "essentially said, rather shyly, that he believes that something might be wrong with his mother. He seemed genuinely frightened at the idea that he might have to go back to his mother."

Dr. Simoneaux stated that there was nothing in his observations or in his time with Q that would suggest the presence of virtually any of the diagnoses that had been offered. He found that Q was certainly not psychotic, and he appeared intelligent and articulate. He was not anxious or depressed and, in fact, seemed happy. Although he admits he saw Q only that one day, Q did not exhibit any signs of emotional distress or trauma that his mother historically described.

Dr. Simoneaux also conducted testing and interviews with Henderson, including the Minnesota Multiphasic Personality Inventory-2 test, which returned with some troubling results. Based on her answers, he believed there was a "good chance" that she suffered from a psychological disorder that could "get in the way of her accurate view" of the circumstances. The results of the testing he performed on her and some of her behaviors through the course of the involvement with the DCFS "suggest that she may indeed be delusional."

Henderson's witness, Dr. Lionel Guillaume, a psychiatrist, evaluated her. He did not diagnose her but only reached an "impression" and found no evidence of psychosis or mood disorder.

Dr. Simoneaux reviewed the documentation in the case and noted there was an affidavit regarding a multidisciplinary team conference in which Dr. Perry Hill participated. The affidavit stated that Dr. Hill reviewed the records from one of the mental health care facilities to which Q had been admitted, and it was his opinion that the child "is suffering from emotional maltreatment by his adopted mother." Based on the documents presented to him at the team conference and Dr. Simoneaux's notations, Dr. Hill further opined that the child would stabilize while in the hospital but then would regress upon return home.

At the end of Dr. Simoneaux's report, he recommended to the DCFS that they consider keeping Q in a foster care environment and away from Henderson's influence for a period of six months in order to observe whether Q engaged in any of the behaviors described by Henderson. He opined that the "sexual acting out, the chronic masturbation, and the aggressive behaviors" should all be evident fairly soon if Henderson's accusations were correct. He stated that if those behaviors were not seen, then Henderson's assertions would be incorrect, and it could be assumed that whatever had been reported in the past was the product of the interaction between Q and Henderson and not necessarily that Q suffered from mental illness.

For the period of February through May 2019, Q attended treatment with Letrisha Walker, a therapist. Her treatment update noted that Q presents as a well-adjusted child who is enjoying being a kid. She stated that

6

he participates in the session, makes good grades and does well at school, and enjoys participating in sports. He continues to express his feelings of not wanting to visit or be reunited with Henderson and, in fact, is adamant about not wanting to return to her care. He also states that he is content with being at the home of Reggie Hodge, his foster father.

After his removal on June 4, 2018, Q never returned to Henderson's care. Her parental rights were terminated after a September 23, 2019 trial in Bossier Parish, and that termination was affirmed by this court in *State in Int. of J.D.*, 53,432 (La. App. 2 Cir. 2/5/20), 290 So. 3d 738.

Mr. Hodge reported that Q is experiencing great successes now that he no longer lives with Henderson. He is enrolled in middle school in Bossier City, is in the gifted program and was elected school president. He has many friends, and there have been no reports of inappropriate behavior. He only sees the doctor for regular wellness checkups and is no longer prescribed daily medications. Mr. Hodge and his wife intend to adopt Q.

Following the hearing and his review of all the documents in this matter, the ALJ ruled that the DCFS had met its burden of proof that the determination of dependency was valid. Henderson appealed the administrative decision to the Bossier Parish district court, which also affirmed the ALJ's judgment. Henderson now appeals those rulings.

## DISCUSSION

Henderson's only assignment of error is that the ALJ erred in ruling that the DCFS met its burden of proof in finding that the determination of dependency against her is valid. She argues that it is without dispute that when Q entered her home, he presented with a myriad of psychological, emotional and behavioral problems, which were caused by his biological

7

mother's history of drug and alcohol abuse. She contends that despite the volumes of Q's medical history she provided to the DCFS and the ALJ, their decisions were based on the testimony and report of Dr. Simoneaux. She asserts that Dr. Simoneaux never treated Q and only saw him once and that he "posited a false narrative" that if the child improved medically when he is not in her home for an extended time, then it is she who is harmful to the child.

Henderson also argues that the ALJ based his decision on the professional opinion of Dr. Perry Hill, another person who had never treated Q or her. She points out that Dr. Hill had even less of a basis of fact than Dr. Simoneaux, yet his participation in a team meeting was mentioned in the ALJ's decision.

Henderson further argues that even though the DCFS might conclude that another home would be "better" for Q's emotional, physical and developmental needs, that does not necessarily mean that his previous home is bad or neglectful. She contends that the DCFS failed to meet its burden of proof in this case.

The DCFS argues that it has the responsibility to investigate allegations of child abuse and/or neglect and is the state agency which maintains the repository and state central registry of valid abuse and/or neglect findings. It contends that the caseworker's well-documented, thorough investigation justified the valid finding of dependency of this child. The finding was made based upon statements of the victim, perpetrator and collaterals in accordance with the DCFS policies, and there is clearly enough evidence to justify the valid determination and affirm the ruling of the ALJ.

La. Ch. C. art. 616.1.1(A) concerns rights of appeal of a determination of dependency and states, in pertinent part, as follows:

> When a report alleging abuse or neglect is determined to be justified by the department, the individual who is or was the subject of the determination may make a formal written request to the division of administrative law for an administrative appeal of the justified determination, in accordance with the procedures set forth in Title 67 of the Louisiana Administrative Code.

When reviewing an administrative final decision in an adjudication proceeding, the district court functions as an appellate court. *Cox v. Sec'y, Louisiana Dep't of Health & Hosps.*, 41,391 (La. App. 2 Cir. 8/25/06), 939 So. 2d 550, *writ denied*, 06-2576 (La. 12/15/06), 944 So. 2d 1274. Once a final judgment is rendered by the district court, an aggrieved party may seek review by appeal to the appropriate appellate court. *Id*. On review of the district court's judgment, no deference is owed by the court of appeal to the factual findings or legal conclusions of the district court, just as no deference is owed by the Louisiana Supreme Court to factual findings or legal conclusions of the court of appeal. *Id*. Thus, an appellate court sitting in review of an administrative agency reviews the findings and decision of the administrative agency and not the decision of the district court. *Id*.

The applicable standard of review is set forth in La. R.S. 49:964. *Law v. Dep't of Health & Hosps.*, 43,417 (La. App. 2 Cir. 8/13/08), 989 So. 2d 871, *writ denied*, 08-2225 (La. 12/12/08), 996 So. 2d 1118. The trial court and the court of appeal have the authority to reverse or modify the decision of the agency if substantial rights of the party seeking review have been prejudiced because the administrative findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the agency's statutory authority; (3) made upon unlawful

9

procedures; (4) affected by other error of law; (5) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (6) manifestly erroneous in view of the reliable, probative and substantial evidence in the record. *Id.*

*Dependency*

DCFS investigates allegations of child abuse and neglect to determine if there is a valid finding of abuse or neglect by an individual of a child. DCFS Policy for the Office of Community Services, Chapter 4, Part 5, Section 4-515; 67 La. Admin. Code Pt V, 1111. It has the burden of proving by a preponderance of the evidence that its determination of a valid finding of child neglect by dependency should be upheld. 67 La. Admin. Code Pt V, 1111.F. 5. Its validity determination is a two-step process. The first step is to determine whether an individual's conduct met the definitional requirements needed to make an "allegation determination." If the definitional requirements are met, then the second step is to determine whether the conduct constituted a valid finding. Dependency is defined under the DCFS Policy for Child Welfare, Chapter 4, Appendix 4-B, in pertinent part, as follows:

> Being without reasonable or necessary food, clothing, shelter, medical care, supervision or other care, or without parental care or guardianship, as a result of the severe mental illness, chronic physical illness or physical disability, mental retardation, death, incarceration, chemical abuse, or other condition related to the parent's ability to care for the child.

The investigation performed by the DCFS resulted in a collection of documents, interviews of witnesses and statements by physicians and therapists proving, by a preponderance of the evidence, that Henderson is unable to reasonably care for Q and unable to attend to his medical,

10

emotional and developmental needs.  The DCFS proved that Henderson was not meeting Q's needs and, in fact, was severely harming him, causing him to be placed in mental hospitals and forced to take drugs because of behavior she provoked or fabricated.  Q's behavior as noted by Henderson was so bizarre that Dr. Simoneaux stated that he had never seen a person with that many diagnoses, some of which were not even given to children.  Once the DCFS removed Q from her care, he improved quickly—medically, emotionally, developmentally and socially.  He exhibited none of the aberrant behaviors about which Henderson had complained for years.  He was able to eliminate his medications; attend school without any problems; and, in fact, thrive by making excellent grades, making friends and participating in sports.

To further meet the definition of "dependency," the DCFS was required to also prove that Q's lack of medical care, supervision or other care, or being without parental care or guardianship, was due to the "severe mental illness, physical illness or physical disability" or other condition related to the parent's ability to care for him.  Through Dr. Simoneaux's evaluation and testing of Henderson, he found she suffered from a psychological disorder that could "get in the way of her accurate view" of the circumstances.  He also opined that the results of the testing he performed on her suggested she might be delusional.

*Valid Determination*

The DCFS policy for Office of Community Services, Chapter 4, Part 5, states that when determining whether allegations of child abuse and neglect are valid, the following standards apply:

11

The available facts when viewed in light of surrounding circumstances would cause a reasonable person to believe that the following exists:

(a) An act or physical or mental injury which seriously endangered a child's physical, mental or emotional health or safety; or

(b) A refusal or unreasonable failure to provide necessary food, clothing, shelter, care, treatment or counseling which substantially threatened or impaired a child's physical, mental, or emotional health and safety; . . . and,

(c) The direct or indirect cause of the alleged injury, harm, or extreme threat of harm is a parent.

If the answers to (a) or (b) and (c) are "yes," then the allegation is valid.

We agree that the DCFS met its burden of proof in showing by a preponderance of the evidence that it validly made a determination of neglect based on dependency. Henderson's actions seriously endangered Q's physical, mental and emotional health and safety; and the direct cause of the injury was her behavior, possibly caused by her own mental health issues.

This assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the ALJ finding that the DCFS proved the evidence met its policy requirements for making a valid determination against Henderson of neglect based on dependency. Costs of this appeal are assessed to Defendant Fregener Davis Henderson.

**AFFIRMED**.

12